**GUTRIDE SAFIER LLP**
SETH A. SAFIER (State Bar No. 197427)
seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
marie@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile: (415) 449-6469

Attorneys for Petitioner

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VISHAL SHAH, an individual, on behalf of himself, the general public, and those similarly situated<br><br>    Petitioner,<br><br>        v.<br><br>POLITICO LLC,<br><br>    Respondent. | CASE NO.<br><br>**PETITION TO CONFIRM ARBITRATION AWARD** |

-1-

Petition to Confirm Arbitration Award

**<u>INTRODUCTION</u>**

1.  Petitioner Vishal Shah, by and through his undersigned counsel, brings this action to confirm an arbitral award against Respondent Politico LLC ("Politico" or "Respondent") pursuant to Section 9 of the Federal Arbitration Act, 9 U.S.C. § 9. The arbitral award was made in the San Francisco office of the Judicial Arbitration and Mediation Services.

2.  For background, Petitioner's underlying claims concern Respondent's egregious privacy violation and breach of consumer trust in blatant violation of California law. Respondent owns and operates a website, www.politico.com (the "Website"), which allows visitors to, among other things, read news articles about a variety of topics, primarily politics and policy. Like most internet websites, Respondent designed the Website to include resources and programming scripts from third parties that enable those parties to place cookies and other similar tracking technologies on visitors' browsers and devices and/or transmit cookies along with user data.

3.  Unlike many internet websites, however, Respondent's Website purports to offer all visiting consumers the choice to browse the Website without being tracked, followed, and targeted by third party data brokers and advertisers. The Website does this by displaying a pop-up cookie consent banner to Website visitors, which informs visitors that the Website uses cookies to "enhance user experience and to analyze performance and traffic" on the Website and to "share information about your use of our site with our social media, advertising and analytics partners." Respondent purports to give users the option to choose to "Do Not Sell My Information" rather than accepting cookies. In the cookie consent preference window, Respondent represents that users can "choose not to allow certain types of cookies" including Performance Cookies and Online Behavioral Advertising cookies. Exemplars of Respondent's initial pop-up cookie banner and cookie consent preference window on the Website, from 2023, are included below:

This website uses cookies to enhance user experience and to analyze performance and traffic on our website. We also share information about your use of our site with our social media, advertising and analytics partners. Privacy Policy

Do Not Sell My Information     Accept Cookies

Petition to Confirm Arbitration Award

 

4. Many of the millions of visitors to Respondent's Websites, including Petitioner, did just that—they chose "Do Not Sell My Information" and to reject "Performance Cookies" and "Online Behavioral Advertising" cookies and proceeded to browse the Websites. Unfortunately, Respondent's privacy promises were outright lies, designed to lull users into a false sense of security. Unbeknownst to the users, and contrary to their express rejection of all such cookies, Respondent nonetheless caused cookies to be stored on the visitors' devices. In doing so, Respondent caused the transmission of users' personal data to undisclosed third parties, contrary to Respondent's representations.

5. Many of the third-party cookies that Respondent wrongfully caused to be placed on Petitioner's and other consumers' devices are designed to track consumers' behavior across websites for marketing purposes. These third-party cookies can enable third parties to track and collect data in real time regarding Website visitors' behaviors and communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data. Third parties analyze and aggregate this user data across websites and time for their own purposes and financial gain, including, creating consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; creating audience segments based on shared traits; and performing targeted advertising and marketing analytics. Further, the third parties share user data

-2-

Petition to Confirm Arbitration Award

and/or user profiles to unknown parties to further their financial gain. This type of tracking and data sharing is exactly what Petitioner and the other consumers who rejected all non-strictly necessary cookies sought to avoid. In disregarding Petitioner and the Website visitors' express refusal to consent to such cookies, Respondent violated state statutes and its common law duties to Petitioner and those visitors to the Website.

6. Prior to asserting claims on behalf of himself and a class of similarly harmed individuals, Petitioner obtained an arbitral award finding that Petitioner is not subject to Respondent's arbitration and class action waiver provisions in the Website's Terms of Service. Petitioner now seeks to confirm that arbitral award so that he can pursue class claims against Respondent for its breach of consumer trust and wanton privacy violations.

## **PARTIES**

7. Petitioner Vishal Shah is, and at all times alleged herein was, an individual and a resident of San Jose, California. Petitioner intends to remain in California and makes his permanent home there.

8. Respondent Politico LLC is a Delaware limited liability corporation with its principal place of business in Arlington, Virginia. Politico has substantial contacts with and receives substantial benefits and income from California and throughout the United States.

## **JURISDICTION AND VENUE**

9. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Petitioner and Respondent, and the amount in controversy (that is, the value of the arbitral award), exclusive of interest and costs, exceeds $75,000.

10. As set forth in the arbitral award (*see* Exhibit A), Petitioner is not subject to Respondent's website Terms of Service. Petitioner thus may assert claims in court on behalf of a putative class, for Respondent's privacy violations, misrepresentations, unjust enrichment, and trespass to chattels. Such a class action would seek injunctive relief as well as statutory damages of $5,000 *per violation* (and there were numerous violations, occurring each time Respondent caused the placement or transmission of third-party cookies on a Website visitor's device or

browser after that person had declined such cookies on Respondent's Website), punitive damages, compensatory damages and/or restitution. Accordingly, the value of the award—finding that Petitioner is not limited to an individual arbitration—exceeds $75,000.

11. This Court has personal jurisdiction over Respondent for the limited purpose of confirming the arbitration award because Respondent agreed to arbitrate in San Francisco, California, and fully participated in the arbitration in San Francisco, thereby consenting to jurisdiction in California and purposefully availing itself of the privilege of conducting activities (and, in particular, litigating the issues decided in the award) in California. This petition arises out of Respondent's arbitration activities in California, and it is reasonable for the Court to exercise jurisdiction over Respondent for purposes of confirming the award.

12. In addition, Respondent regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from products and services provided to persons in the State of California. Respondent has engaged, and continues to engage, in substantial and continuous business practices in the State of California. California's long-arm statute permits the exercise of jurisdiction to the limits of due process. *See* Cal. Civ. Proc. Code § 410.10.

13. Venue is proper in this District pursuant to 9 U.S.C.S. § 9, which provides that "[i]f no court is specified in the agreement of the parties, then such application may be made to the United States court in and for the district within which such award was made." Here, the parties agreed to arbitrate gateway issues of arbitrability in San Francisco, there was no pre-dispute agreement between the parties specifying where the award must be confirmed, and the arbitration was held and the award was made in the San Francisco office of the American Arbitration Association.

14. Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events (that is, the arbitration) giving rise to this Petition occurred within this District.

15. Petitioner accordingly alleges that jurisdiction and venue are proper in this Court.

**LEGAL STANDARD**

16.    Confirmation of an arbitration award "is a summary proceeding that converts a final arbitration award into a judgment of the court." *Ministry of Def. & Support v. Cubic Def. Sys.*, 665 F.3d 1091, 1094 n.1 (9th Cir. 2011); *accord Int'l Petroleum Prods. & Additives Co. v. Black Gold, S.A.R.L.*, 418 F. Supp. 3d 481, 487 (N.D. Cal. 2019). Judicial review of an arbitration award, including on arbitrability issues, is both limited and highly deferential. *PowerAgent Inc. v. Elec. Data Sys. Corp.*, 358 F.3d 1187, 1193 (9th Cir. 2004). "Neither erroneous legal conclusions nor unsubstantiated factual findings justify federal court review" of an arbitration award under the Federal Arbitration Act ("FAA"). *Kyocera Corp. v. Prudential-Bache T Servs.*, 341 F.3d 987, 994 (9th Cir. 2003) (en banc).

17.    Under 9 U.S.C. § 10(a), there are only four, extremely limited grounds to vacate an arbitration award:

- where the award was procured by corruption, fraud, or undue means;
- where there was evident partiality or corruption in the arbitrators, or either of them;
- where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
- where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

18.    In addition, the "burden of establishing grounds for vacating an arbitration award is on the party seeking [vacatur]." *U.S. Life Ins. Co. v. Superior Nat'l Ins. Co.*, 591 F.3d 1167, 1173 (9th Cir. 2010).

**SUBSTANTIVE ALLEGATIONS**

19.    On December 21, 2023, Petitioner filed a demand for arbitration in San Francisco with the American Arbitration Association. Exhibit B.

20. Arbitrator Gary Nadler was assigned as the arbitrator.

21. Following an initial conference, the Arbitrator ordered briefing regarding his jurisdiction and arbitrability.

22. After receiving briefing and supporting evidence from the parties, the Arbitrator issued a final order/award, dated July 29, 2024, concluding: There was no evidence that Petitioner had actual or constructive knowledge of the Terms of Service; Petitioner did not manifest consent to the agreement to arbitrate; Petitioner did not waive his right to challenge arbitrability of the dispute; and Petitioner is not bound by the arbitration agreement. Exhibit A.

23. The AAA subsequently issued a closing letter, dated August 21, 2024, confirming that it had closed the arbitration as dismissed. Exhibit C.

24. The FAA provides that a court "must" confirm an arbitration award if any party to the arbitration applies for an order confirming the award within one year after the award is made, "unless the award is vacated, modified, or corrected." 9 U.S.C. § 9.

25. The award was not procured by corruption, fraud, or undue means.

26. There was no evident partiality or corruption in the arbitrator.

27. The arbitrator was not guilty of any misconduct in refusing to postpone a hearing, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior prejudicial to the rights of Respondent.

28. The arbitrator did not exceed his powers, or so imperfectly execute them that a mutual, final, and definite award upon the subject matter submitted was not made.

29. Because the award has not been vacated and there is no ground to vacate the award, it must be confirmed.

Petition to Confirm Arbitration Award

## **PRAYER FOR RELIEF**

WHEREFORE, Petitioner respectfully requests that the Court confirm the arbitral award, and provide Petitioner with any further relief as the Court deems proper.

Dated:      February 7, 2025          **GUTRIDE SAFIER LLP**

*/s/Seth A. Safier/s/*
Seth A. Safier, Esq.
100 Pine Street, Suite 1250
San Francisco, CA 94111

Petition to Confirm Arbitration Award

# EXHIBIT A

**JAMS ARBITRATION NO. 5100001737**

VISHAL SHAH,

      Claimant,

              v.

POLITICO, LLC,

      Respondent.

_____/

**RULING RE: CLAIMANT'S MOTION RE: NON-ARBITRABILITY**

## I.    <u>INTRODUCTION</u>

Before the Arbitrator is Claimant Vishal Shah's Motion Re Non-Arbitrability.

Claimant VISHAL SHAH filed his "Complaint and Demand for Arbitration" on December 21, 2023. The complaint, consisting of 55 pages, contains substantive allegations and fourteen causes of action. The complaint *does not* contain any allegation, argument or defense relative to his current claim that the matter is not to be determined by arbitration. However, footnote 1 does assert that "Claimant does not assent to Respondent's arbitration agreement, and/or that the purported arbitration agreement is unlawful and/or unenforceable."

Pursuant to the applicable "JAMS Comprehensive Arbitration Rules & Procedures", Rule 11(b) provides in relevant part as follows:

> "Jurisdictional and arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought, and who are proper Parties to the Arbitration, shall be submitted to and ruled on by the Arbitrator. The Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter."

## II.    <u>WHETHER THERE WAS AGREEMENT BETWEEN THE PARTIES</u>

On December 21, 2023, Claimant Vishal Shah filed a complaint entitled "COMPLAINT AND DEMAND FOR ARBITRATION". This was uploaded to JAMS, along with the following documents: (1) "Amount in Controversy: according to proof"; and (2) "POLITICO TERMS OF SERVICE". The TERMS OF SERVICE document included a section entitled "ARBITRATION AGREEMENT" which described the scope of claims that were required to be resolved by binding arbitration rather than in court. The agreement further provided that JAMS rules were applicable. These documents were uploaded to JAMS.

Claimant Vishal Shah testified by declaration that he did not know that his continued use of Respondent's Website was subject to arbitration, and that he did not see a link at the bottom of the Website to the Terms of Service in which there was an arbitration clause.

1

A Declaration of Seth A. Safier was filed in support of the motion. Mr. Safier, counsel for Claimant, provided that prior to filing the arbitration on behalf of Claimant, he had "several" conversations with counsel for Respondent in which he reported that Mr. Shah "did not assent to arbitrate his claims" and asked that the arbitration requirements be waived to permit the issue of arbitrability to be determined in court. According to Mr. Safier, this was refused. Counsel for Politico was not identified. However, during the initial hearing on July 15, 2024, Mr. Fagelman confirmed that it was he who conversed with Mr. Safier.

A.  <u>The Validity of the Internet Contract</u>

Claimant provides that the Websites do have a link to the "Terms of Service" at the bottom of the page below all the substantive content. The provided screenshot indicates that the "notice" is inconspicuous, written in a small and hard to read font. It is not in a different color or font or size from surrounding text; it is not highlighted, emboldened, or underlined. As compared with the images elsewhere, it is very small and much less conspicuous.

As explained in *Nguyen v. Barnes & Noble Inc.* (9th Cir. 2014) 763 F.3d 1171 at 1175-1176 [internal citations and quotations omitted]:

> "Contracts formed on the Internet come primarily in two flavors: 'clickwrap' (or "click-through") agreements, in which website users are required to click on an 'I agree' box after being presented with a list of terms and conditions of use; and 'browsewrap' agreements, where a website's terms and conditions of use are generally posted on the website via a hyperlink at the bottom of the screen."

> "Unlike a clickwrap agreement, a browsewrap agreement does not require the user to manifest assent to the terms and conditions expressly ... [a] party instead gives his assent simply by using the website. Indeed, in a pure-form browsewrap agreement, the website will contain a notice that—by merely using the services of, obtaining information from, or initiating applications within the website—the user is agreeing to and is bound by the site's terms of service. Thus, by visiting the website—something that the user has already done—the user agrees to the Terms of Use not listed on the site itself but available only by clicking a hyperlink. The defining feature of browsewrap agreements is that the user can continue to use the website or its services without visiting the page hosting the browsewrap agreement or even knowing that such a webpage exists. Because no affirmative action is required by the website user to agree to the terms of a contract other than his or her use of the website, the determination of the validity of the browsewrap contract depends on whether the user has actual or constructive knowledge of a website's terms and conditions...." "But where …there is no evidence that the website user had actual knowledge of the agreement, the validity of the browsewrap agreement turns on whether the website puts a reasonably prudent user on inquiry notice of the terms of the contract." *Nguyen v. Barnes & Noble Inc.* (9th Cir. 2014) 763 F.3d 1171 at 1177.

2

In *Berman v. Freedom Financial Network, LLC* (9th Cir. 2022) 30 F.4th 849, 856 [internal citations omitted], the court provided:

> "To avoid the unfairness of enforcing contractual terms that consumers never intended to accept, courts confronted with online agreements such as those at issue here have devised rules to determine whether meaningful assent has been given. Unless the website operator can show that a consumer has actual knowledge of the agreement, an enforceable contract will be found based on an inquiry notice theory only if: (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms. As the Second Circuit has explained, '[r]easonably conspicuous notice of the existence of contract terms and unambiguous manifestation of assent to those terms by consumers are essential if electronic bargaining is to have integrity and credibility'." …

Continuing at page 857 to 858:

> "A web designer must do more than simply underscore the hyperlinked text in order to ensure that it is sufficiently 'set apart' from the surrounding text. Customary design elements denoting the existence of a hyperlink include the use of a contrasting font color (typically blue) and the use of all capital letters, both of which can alert a user that the particular text differs from other plain text in that it provides a clickable pathway to another webpage…. Consumers cannot be required to hover their mouse over otherwise plain-looking text or aimlessly click on words on a page in an effort to "ferret out hyperlinks." The failure to clearly denote the hyperlinks here fails our conspicuousness test."

> *"Unambiguous manifestation of assent.* In using the websites, Hernandez and Russell did not take any action that unambiguously manifested their assent to be bound by the terms and conditions. Defendants rely on plaintiffs' act of clicking on the large green "continue" buttons as manifestation of their assent, but merely clicking on a button on a webpage, viewed in the abstract, does not signify a user's agreement to anything. A user's click of a button can be construed as an unambiguous manifestation of assent only if the user is explicitly advised that the act of clicking will constitute assent to the terms and conditions of an agreement. The presence of 'an explicit textual notice that continued use will act as a manifestation of the user's intent to be bound' is critical to the enforceability of any browsewrap-type agreement. …  the notice must explicitly notify a user of the legal significance of the action she must take to enter into a contractual agreement."

The webpages here did provide advisals concerning the terms and conditions in proximity to the "continue" buttons. On the webpage Russell visited, the notice appeared directly above the button, and on the webpage Hernandez visited it appeared above the button separated by several

3

intervening lines of text. But "even close proximity of the hyperlink to relevant buttons users must click on—without more—is insufficient to give rise to constructive notice." …

Rather, the notice must explicitly notify a user of the legal significance of the action she must take to enter into a contractual agreement. The notice did not do so here. Both webpages stated, "I understand and agree to the Terms & Conditions," but they did not indicate to the user what action would constitute assent to those terms and conditions. Likewise, the text of the button itself gave no indication that it would bind plaintiffs to a set of terms and conditions. This notice defect could easily have been remedied by including language such as, "By clicking the Continue… button, you agree to the Terms & Conditions." *See, e.g., Meyer*, 868 F.3d at 78-80 (concluding that an enforceable agreement was formed where the mobile app explicitly warned, "By creating an Uber account, you agree to the TERMS OF SERVICE & PRIVACY POLICY").

As described by Claimant, when he visited the website, a popup of a cookie banner was displayed. The cookie banner discloses that the website uses cookies and shares information via cookies with "social media, advertising and analytics partners" and provides users the opportunity to select "Accept Cookies" or "Do Not Sell My Information". When Claimant selected the "Do Not Sell My Information" link, a new popup presented entitled "Do Not Sell My Personal Information". Here, an option is presented where one can choose not to allow certain types of cookies and that the choice may impact the users' experience of the site and the services offered. The section provides that the user may "[c]lick on the different category headings to find out more and change our default setting according to your preferences."  This then gives users the option to opt-out of "Performance Cookies" and "Online Behavioral Advertising". Nothing references the terms of service, or adoption of any terms of service.

There is a link to the Terms of Service at the bottom of the webpage which presents substance such as links to news items. At least as presented in these moving papers, the "Terms of Service" link is not conspicuous either by way of size, color, or font. It appears quite small and is far less conspicuous than the images and text elsewhere on the website.

As shown above, determination of the validity of the purported contract here involved depends first on whether the user has actual or constructive knowledge of a website's terms and conditions.  If it is determined that the website user here did not have actual knowledge of the agreement, the validity of the browsewrap agreement is dependent on whether the website puts a reasonably prudent user on inquiry notice of the terms of the contract.

    *1. Whether Claimant Had Actual or Constructive Knowledge Of The Arbitration Requirement*

There is no evidence that Claimant had actual knowledge of the POLITICO LLC's Terms of Service. Claimant submitted a declaration dated May 29, 2024, in which he provides that during the use of the subject website, he did not know that his "continued use of the Website was subject to arbitration with Politico". Further, Mr. Shah declares that he "did not see a link at the bottom of the Website to the Terms of Service".

4

Evidence that Claimant's counsel communicated with Politico's counsel was insufficient to overcome this determination.

In addition to the foregoing, there is no evidence of sufficient constructive notice. The website itself was insufficient to convey the existence of the Terms of Service, in which was located the terms of arbitration. Claimant asserts that there is no option to arrive at the Terms of Service when managing the cookie screen. As noted by Claimant, when viewing a page on the website there is a small banner at the bottom of the page which has, within it, a link to the Terms of Service. However, Claimant notes that this link is not conspicuous, highlighted, emboldened, or underlined. It is noted that a user such as Claimant would not know or have reasonably conspicuous notice that use of the website would lead to any agreement to arbitrate. Claimant further states in his declaration that when he visited the subject website, he did not know that his continued use of it was subject to arbitration with Politico and that he did not see a link at the bottom of the website page to the Terms of Service.

### 2. Whether There Was a Waiver of the Right to Challenge Arbitrability

As noted by Claimant, the doctrine of waiver is defined as an intentional relinquishment or abandonment of a known right. *United States v. Olano*, 507 U.S. 725. Claimant argues that there was no waiver of the issue of arbitrability for various reasons.

Politico notes that it was Claimant who filed a demand for arbitration *before* engaging directly. However, the right to object to arbitrability was reserved at footnote 1, on the first page of the complaint and arbitration demand.

Claimant's arbitration demand was signed and filed on December 21, 2023. In his declaration, counsel Seth A. Safier declares that he "later had a conversation with counsel for Politico wherein [he] explained that Claimant did not assent to arbitrate his claims" and asked for a waiver of the arbitration requirement.

Respondent Politico LLC, in its brief in opposition to the motion, argues that by following the parameters of the Terms of Service in filing the arbitration "of his own volition" … Claimant "establishes his knowledge of and acceptance of the Arbitration Agreement." It is further asserted that *even if* Claimant learned about the arbitration provision after he was harmed, his later assent to the arbitration process would overcome that lack of prior knowledge.

Claimant first argues that Courts typically find no waiver despite a party's filing an arbitration demand where there is an immediate and ongoing objection to the arbitration, or the participation was necessary to preserve the litigant's rights. In the instant matter, it is asserted that the demand for arbitration was filed "only because of the delegation clause in the arbitration agreement" which purportedly is at issue. Counsel for Claimant asserts that there were ongoing objections to the arbitration made but that the demand was filed to preserve Claimant's rights. In fact, the complaint and arbitration demand contain a footnote in which Claimant reserves his objection despite the filing.

In support of his claim that there was no intentional relinquishment of a known right, counsel Seth A. Safier submitted a declaration in which he noted that he had "several conversations

5

with counsel for Politico, LLC" during which he explained to Respondent that Claimant did not assent to arbitration of his claims. In addition, according to Mr. Safier, he requested Politico to waive the arbitration requirements or allow Claimant to have the courts decide the threshold issue of arbitrability. Although the declaration fails to include the identity of the counsel for Politico that he spoke with, as noted below, Mr. Fagelman confirms that it was he. The declaration indicates that the conversations that were referenced occurred prior to filing the arbitration demand with JAMS.

In Response to this motion, Politico asserts that (1) by filing with JAMS, Claimant's conduct manifests his express assent to the arbitration terms as contained in the Terms of Service. This, according to Respondent, constitutes an express waiver of the later attempt to object; (2) that Claimant filed the arbitration demand with JAMS more than three weeks before the first *written* communication between counsel for Claimant and Respondent; and almost four weeks before the first discussion between counsel. As such, Respondent argues that the filing constituted an express waiver of any right to contest the arbitrability issue raised by Claimant.

A declaration was filed by Jason K. Fagelman, counsel for Respondent. Mr. Fagelman declares that he reviewed the declaration of Mr. Safier. For reference, he notes that the demand for arbitration was filed on December 21, 2023. Mr. Fagelman stated that he has no record or recollection of any communication with Mr. Safier about the subject motion before the arbitration demand was filed. He further states that according to his records and recollection he first emailed with Mr. Safier on January 12, 2024, which was 22 days after filing. Further, he testified that he first discussed this arbitration with Mr. Safier on January 17, 2024, which is 27 days after the arbitration demand was filed.

A reply declaration was filed by Seth A. Safier.  In it, Mr. Safier indicates that he caused a demand letter to be sent to Respondent on August 18, 2023, and that Respondent did not respond. As the result of that non-response, he filed the demand for arbitration on behalf of Claimant. Mr. Safier's declaration then noted that he had a later conversation with counsel for Politico; it was at the time of this conversation that a request was made that Respondent waive its arbitration requirements or to allow Claimant to have the threshold issue of arbitrability to be determined by the court. As noted previously in the moving papers, these requests were refused.

Based upon the foregoing, it is determined that: (1) the request for waiver was made after filing of the demand for arbitration with JAMS; and (2) the complaint and arbitration demand included an objection to the arbitration process at footnote 1. There was no waiver of the right to object to arbitrability of this matter.

For the reasons stated herein, the Arbitrator determines that the matter here involved is not subject to arbitration; the motion is granted.

Dated: July 29, 2024

Hon. Gary Nadler (Ret.)
Arbitrator

6

# EXHIBIT B

**GUTRIDE SAFIER LLP**
Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
  marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
  todd@gutridesafier.com
Kali R. Backer (State Bar No. 342492)
  kali@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469

*Attorneys for Claimant*

## JUDICIAL ARBITRATION AND MEDIATION SERVICES

### SAN FRANCISCO REGIONAL OFFICE

| | |
|---|---|
| VISHAL SHAH, an individual, on behalf of himself, the general public, and those similarly situated,<br><br>　　　　　　Claimant,<br><br>　　v.<br><br>POLITICO LLC,<br><br>　　　　　　Respondent. | JAMS Reference No.<br><br>**COMPLAINT AND DEMAND FOR ARBITRATION** |

Claimant Vishal Shah ("Claimant") brings this action on behalf of himself, the general public and all others similarly situated against Politico LLC ("Respondent" or "Politico").[1] Claimant's allegations are based upon information and belief and upon investigation of Claimant's counsel, except for allegations specifically pertaining to Claimant, which are based upon Claimant's personal knowledge.

### INTRODUCTION

1.　　　This Complaint and Arbitration Demand concerns an egregious privacy violation and breach of consumer trust in blatant violation of California law. Respondent's

---

[1] Claimant files this Complaint and Arbitration Demand without waiver of any right or argument, including without limitation, that Claimant did not assent to Respondent's arbitration agreement and/or that the purported arbitration agreement is unlawful and/or unenforceable.

website www.politico.com (the "Website") is configured to use a multitude of cookies to enable third parties to track users' activity and communications on the Website even after users reject such cookies. At least until it was put on notice of the allegations herein by Claimant, Respondent presented all visitors to the Website with a pop-up cookies banner that gave users the option to select "Do Not Sell My Information" and adjust the cookie settings and reject all all cookies not strictly necessary to the operation of the Website, i.e., "Performance Cookies" and "Online Behavioural Advertising" cookies—including "Targeting Cookies," "Social Media Cookies," and "Google." Hundreds of thousands of Website users did just that—they rejected Performance Cookies and Online Behavioural Advertising cookies and proceeded to browse the Website. But, unbeknownst to them, and contrary to the express rejection of *all* such cookies, Respondent nonetheless caused Performance Cookies and Online Behavioural Advertising cookies—both from Respondent and third parties with notorious privacy records, including LinkedIn, Google/DoubleClick, and Yahoo—to be stored on the devices and browsers of Claimant and those similarly situated. In doing so, Respondent caused the transmission of extensive data about Claimant, and those similarly situated, to undisclosed third parties, contrary to Respondent's representations and Claimant's and other consumers' express directions.

2.      Many of the third-party cookies that Respondent wrongfully placed on Claimant's and other consumers' devices and browsers are designed to track consumers' behavior across websites for marketing purposes. They are invasive because they allow third parties to track and collect, among other things:  the URLs being browsed by consumers as well as the referrer URL; webpage title; webpage keywords; buttons the consumers click; the exact date and time of the website visits; consumers' IP addresses; product page visits; and/or data entered by Claimant into forms on the Website.

3.      Respondent allowed these third parties access to Claimant's and other consumers' communications with Respondent and enabled them to collect data on consumers for use for those parties' own purposes, including building profiles of consumers' interests and targeting advertising to them. This type of monitoring and data sharing is exactly what the

consumers who opted out of these cookies sought to avoid. Despite receiving notice of consumers' declination of consent, Respondent defied it. In doing so, Respondent violated privacy statutes, state consumer protection statutes, tort duties, and breached its contract and the implied covenant of good faith and fair dealing with Claimant and those similarly situated.[2]

## PARTIES

4.      Claimant Vishal Shah is, and was at all relevant times, an individual and resident of California. Claimant intends to remain in California and makes his permanent home there.

5.      Respondent Politico LLC is a Delaware corporation with its principal place of business in Arlington, Virginia.

## SUBSTANTIVE ALLEGATIONS

6.      Respondent is a United States based politics focused newspaper company and "is the global authority on the intersection of politics, policy, and power." Respondent owns and operates the Website, which allows visitors to, among other things, search for and view political news and policy-related content.

7.      Respondent chose to integrate the Website with cookies from third parties, which, among other things, track users' behavior on the Website.

8.      Cookies are small text files that website servers can cause to be placed on an internet user's device when that user's browser interacts with the website through its servers. First-party cookies are cookies that are placed on a user's browser directly by the webserver with which the user is knowingly communicating (in this case, the Website). Third-party cookies are cookies that are set by other webservers (e.g. google.com, etc.). When a consumer visits the Website, both first-party cookies and third-party cookies are placed on the consumer's browser. All of this is caused by software code that Respondent incorporates into the Website, or that Respondent causes to be loaded. Because Respondent controls the

---

[2] Claimant has not included class allegations in this Complaint and Demand but reserves the right to do so in an amended complaint once the Arbitrator has decided all threshold issues related to this Arbitration, including without limitation, jurisdiction, scope, and applicability.

software code of the Website, it has complete control over whether first-party and third-party cookies are set on users' devices when they visit the Website.

9.    Third-party cookies, including those on the Website, are typically designed to enable companies to track and record an Internet user's communications with, and activities on, websites. Third-party cookies typically work in furtherance of data collection, analytics, behavior profiling, and targeted advertising.

10.    Cookies are the backbone of digital advertising. Because cookies enable third parties to track users' behavior across the Internet and correlate data collected to specific users, advertisers and purveyors of websites can gain deep understanding of users' behavioral traits and target those users with advertisements tailored to their profiles.

11.    As a research director at the Electronic Frontier Foundation put it, third-party cookies, such as those from Meta Platforms, Inc., formerly known as Facebook, Inc., allow these companies "to be a silent third-party watching whatever you're doing."[3]

12.    Every website is hosted by a web server through which it sends and receives communications with Internet users and their web browsers to display web pages on users' devices.

13.    Users communicate with websites by sending HTTP requests, such as "GET" or "POST" requests. For example, when a user clicks on a hyperlink within a website, the user sends an HTTP request command to the web server hosting the website to which the user is sending the communication. The HTTP request command tells the website what information is being requested and instructs the website's server to send the information to the user.

14.    When a website has third-party cookies, those cookies are simultaneously placed on the user's device and browser. This allows third-party cookie companies to intercept the contents of the Internet user's communications with the website and to correlate user data such as the URLs being browsed by the user; the webpage title; button clicks; and the date and

---

[3] Jefferson Graham, Facebook spies on us but not by recording our calls. Here's how the social network knows everything, USA Today (March 4, 2020 4:52 am), https://www.usatoday.com/story/tech/2020/03/04/facebook-not-recording-our-calls-but-has-other-ways-snoop/4795519002/.

COMPLAINT AND DEMAND FOR ARBITRATION

time of the website visit.

**A.    Respondent's Cookie Pop Up Banner Falsely Informed Consumers They May Opt-Out of Certain Types of Cookies.**

15.    When users visited the Website, a cookie pop-up banner was immediately displayed to the user.[4] As shown in the screenshot below, the cookies pop-up banner stated that "This website uses cookies to enhance user experience and to analyze performance and traffic on our website. We also share information about your use of our site with our social media, advertising and analytics partners." The banner provided users the opportunity to select "Do Not Sell My Information" or "Accept Cookies."

16.    Users who clicked the "Do Not Sell My Information" button were presented with the following screen depicted in the screenshot below. The screen represented to users that they "can choose not to allow certain types of cookies, which may impact your experience of the site and the services we are able to offer. Click on the different category headings to find out more and change our default settings according to your preference."

**[Remainder of This Page Intentionally Left Blank]**

---

[4] Since receiving notice from Claimant, Respondent has changed the statements in its cookies pop-up banner. But the substance of choices Respondent offers to consumers remains the same.

COMPLAINT AND DEMAND FOR ARBITRATION



17.    When a Website user clicked on the "+" sign to the left of the cookie categories, the Website user was shown the information in the screenshots below:



COMPLAINT AND DEMAND FOR ARBITRATION





COMPLAINT AND DEMAND FOR ARBITRATION





18.     As indicated in the screenshots above, Respondent's "Online Behavioural Advertising" cookies including "Targeting Cookies," "Social Media Cookies," and "Google."

COMPLAINT AND DEMAND FOR ARBITRATION

Within the description of the "Online Behavioural Advertising" category, Respondent represented to consumers that they "work with third-party ad partners to help us personalize your experience with targeted ads on third-party websites and apps. Our ad partners may collect information about your online interactions with POLITICO for the purposes of delivering the targeted ads. ***You can choose to opt-out of this type of personalization by using the toggle above.*** If you choose to opt-out, while you may still see POLITICO ads, they will not be personalized based on your past interactions with POLITICO using this browser." (Emphasis supplied.)

19.     Respondent's cookies pop-up banner and Respondent's representations on the consent preference center led Claimant, and those similarly situated, to believe that they declined or rejected ***all*** Performance Cookies and Online Behavioural Advertising cookies. Respondent's representations on the cookies pop-up banner and on the consent preference center further led Claimant, and those similarly situated, to believe that Respondent would not hand over their personal information to third parties after Claimant, and those similarity situated, declined or rejected ***all*** Performance Cookies and Online Behavioural Advertising cookies. That belief, however, was false.

20.     In truth, Respondent did not (and still does not) abide by its users' wishes. Even though Respondent received notice that certain users do not consent to the disclosure of their personal information, and the third-party cookies causing such disclosure, when they clicked on the "Do Not Sell My Personal Information" link to visit the consent preference center and rejected Performance Cookies and Online Behavioural Advertising cookies, Respondent nonetheless places third-party tracking cookies on all Website visitors' devices—*even for those users who toggled off the "Performance Cookies" and "Online Behavioural Advertising Cookies."*

21.     In particular, when visitors clicked the "Do Not Sell My Personal Information" link to visit the consent preferences center and rejected Performance Cookies and Online Behavioural Advertising Cookies, Respondent nonetheless continued to cause third-party cookie data and other data to be transmitted to and from consumers' devices, including cookies

from LinkedIn, Google/DoubleClick, Yahoo, and many others. Although Respondent removed its cookie banner from its Website after receiving notice from Claimant, Respondent continues to cause third-party cookie data to be transmitted for Claimant and those similarly situated who previously clicked the "Do Not Sell My Information" button and rejected Performance Cookies and Online Behavioural Advertising cookies.

22.     The following screenshots show examples of the enormous number of third-party cookies that were utilized after a user clicked the "Do Not Sell My Information" link and rejected "Performance Cookies" and "Online Behavioural Advertising" cookies in the consent preference center, indicating their choice/agreement to reject all such cookies except those strictly necessary for the Website's function:



**[Remainder of This Page Intentionally Left Blank]**

COMPLAINT AND DEMAND FOR ARBITRATION



**[Remainder of This Page Intentionally Left Blank]**

COMPLAINT AND DEMAND FOR ARBITRATION



**[Remainder of This Page Intentionally Left Blank]**

COMPLAINT AND DEMAND FOR ARBITRATION



**[Remainder of This Page Intentionally Left Blank]**

COMPLAINT AND DEMAND FOR ARBITRATION



[Remainder of This Page Intentionally Left Blank]

COMPLAINT AND DEMAND FOR ARBITRATION



**[Remainder of This Page Intentionally Left Blank]**

COMPLAINT AND DEMAND FOR ARBITRATION



**[Remainder of This Page Intentionally Left Blank]**

COMPLAINT AND DEMAND FOR ARBITRATION



**[Remainder of This Page Intentionally Left Blank]**

COMPLAINT AND DEMAND FOR ARBITRATION



23.    Many of these third-party cookies, for example those from LinkedIn, Google/DoubleClick, and Yahoo, are "Online Behavioural Advertising" cookies designed to track consumers' behavior across websites for marketing purposes. They allow the third parties to track and collect, among other things: the URLs being browsed by consumers as well as the referrer URL; webpage title; webpage keywords; the exact date and time of the website visits; the IP addresses of consumers' computer; product page visits; and data consumers supply to the Website, such as data entered into forms on the Website. The identifier data sent to the third-party with this information allows that third-party to correlate the data to the user or the

user's device. As such, third parties can—and almost invariably do—use it to develop and enrich profiles on consumers like Claimant and target them with advertising.

24.    The cookies on the Website enable third parties, like LinkedIn, to link individual users and devices with data regarding specific browsing activity on the Website. The cookies that Respondent wrongfully places on users' devices enable third parties to track users' browsing history on the Website. Every time a user visits a new page on the Website after rejecting Performance and Online Behavioural Advertising cookies, more data regarding users' browsing activity is sent to third parties, alongside the cookie data.

**B.    Third Parties Exploit Data Received from the Cookies on the Website**.

25.    The more a user interacts with the Website, the more data third parties amass about the user. The third-party cookies that Respondent wrongfully allows to be stored on users' devices and browsers enable third parties to compile a vast repository of Claimant's browsing history and receive access to information that is otherwise unknowable. Third-party cookie companies leverage the information collected to their advantage, using it to compile browsing histories and habits into personal profiles on consumers, like Claimant, which are sold to advertisers to generate revenue and target users with advertising. In particular, third-party cookies, such as those from the Website, allow third-party cookies companies to draw inferences from information collected about users' browsing and search history on the Website to create profiles about consumers reflecting the consumer's preferences, characteristics, psychological trends, predispositions, behavior, attitudes, intelligence, abilities, and aptitudes.

26.    For example, DoubleClick (which is owned by Google) is the largest provider of Internet advertising. DoubleClick cookies, among other things, collect data about the user, such as user demographics and/or user behaviors, to create and update a profile of the user to fit the preferences of the particular user.

27.    Similarly, StickyADStv provides online video advertising services. The Company creates video advertising campaigns that appear before a program, at the end of a program, and video interactive overlay that helps generate traffic to the advertiser's site.

- 19 -
COMPLAINT AND DEMAND FOR ARBITRATION

28.     The data that the third-party cookies collect is valuable to Respondent as well. Data about users' browsing history enables Respondent to spot patterns in users' behavior on the Website and their interests in, among other things, politics, governmental matters, and more.

29.     Tracking cookies are particularly useful for Respondent's advertising. For instance, if Respondent wanted to market certain content to users, Respondent could use tracking cookies to monitor what consumers visit the webpages related to similar content. Respondent can then advertise related political and governmental news perused by those particular users across the internet.

30.     Respondent's own Privacy Policy dated November 11, 2022 (the "Privacy Policy") admits as much. It stated:

- "This Privacy Policy governs our collection, use, and disclosure of information from and about you, including through your use of the Sites and Applications . . . ."

- "To help make the Sites and Applications more responsive to the needs of users, we employ a standard software feature, called a 'cookie,' to assign each user a unique, random number that resides on a user's computer or device . . . . Cookies help us track user trends and patterns."

- "Our Site also makes use of various third-party cookie data collection and linking services. POLITICO and third-party vendors, including Google, Teads and others, may use first-party cookies (such as the Google Analytics cookies) and third-party cookies (such as the Google Ad Manager cookie) together to (i) inform, optimize, and serve ads based on your past visits to our website and (ii) report how your ad impressions, uses of ad services, and interactions with the foregoing are related to your visits to the Site."

- "We also may use third-party advertising companies to target and serve some of the advertisements that appear on our Sites and Applications, and these companies likewise may use their own cookies, web beacons and similar technologies to collect information about users of our Sites and Applications."

- "The California Consumer Privacy Act (CCPA) sets forth certain obligations for businesses that 'sell' personal information. Based on the definition of 'sell' under the CCPA and under current regulatory guidance, we may have sold the following categories of information about you in the past twelve months: Identifiers (such as name, address, email address, IP address, or device identifiers); internet or other network or device activity; geolocation information; professional or employment related data; potentially protected classifications (such as

- 20 -
COMPLAINT AND DEMAND FOR ARBITRATION

gender, nationality, and age); physical characteristics or description (such as when you voluntarily submit a photo to our Site or Application); inferences related to the information identified. **If you wish to opt out of the sale of your personal information, please follow this link: Do Not Sell My Information**." (emphasis added).

**C.    The Intercepted Data Is Valuable.**

31.    The information that the third-party cookie companies intercept, collect, and track about users through the third-party cookies Respondent causes to be placed on users' devices carries significant economic value. Legal scholars observe that "[p]ersonal information is an important currency in the new millennium." *See* Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 Harv. L. Rev. 2055, 2056–57 (2004). Indeed, "[t]he monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend." *Id*. "Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information." *Id*.

32.    The value of consumers' personal information provided to third parties through the cookies Respondent wrongfully placed can be quantified. For instance, in one study, researchers evaluated the value that 180 internet users placed on keeping personal data secure. Participants valued web browsing history at $52.00 per year and web search history at $57.00 per year.



33.    Similarly, the value of user-correlated web browsing history can be quantified because companies are willing to pay users for the exact type of data that the third parties here intercepted and collected—without permission—through the cookies on the Website. For example, Google Inc. operates a consumer research panel called "Google Screenwise Trends" which, according to Google, is designed "to learn more about how everyday people use the Internet."

34.    As part of the program, panel participants add a browser extension that shares with Google the websites that each panelist visits and how the panelist uses them. The panelists **consent** to Google tracking this information for three months in exchange for one of a number of "gifts," including gift cards to retailers such as Barnes & Noble, Walmart, and Overstock.com.

35.    After three months, Google offers to pay panelists additional gift cards "for staying with" the panel. These gift cards, valued at or around $5, demonstrate conclusively that internet industry participants understand the enormous value in internet users' browsing habits. Google has subsequently offered to pay Screenwise participants up to $3 per week to be tracked.

36.    Other recently-developed platforms offer consumers the opportunity to directly monetize their data. Killi, for instance, is a data exchange platform that allows consumers to own and earn income from their data.[5] Similarly, BIGtoken "is a platform to own and earn from your data. You can use the BIGtoken application to manage your digital data and identity and earn rewards when your data is purchased."[6]

37.    The Nielsen Company is another example. Nielsen has extended its reach to computers and mobile devices through the Nielsen Computer and Mobile Panel. After a consumer installs Nielsen's application on their computer, phone, tablet, e-reader, or other

---

[5] https://killi.io/about-us/

[6] https://bigtoken.com/faq#general_0 ("Third-party applications and sites access BIGtoken to learn more about their consumers and earn revenue from data sales made through their platforms. Our BIG promise: all data acquisition is secure and transparent, with consumers made fully aware of how their data is used and who has access to it.").

COMPLAINT AND DEMAND FOR ARBITRATION

mobile device, Nielsen tracks users' activity. In return, Nielsen enters users into sweepstakes with monetary benefits and compensates users with points worth up to $50 per month.[7]

38.   Technology companies recognize the monetary value of users' sensitive, personal information insofar as they encourage users to install applications explicitly for the purpose of selling that information to technology companies in exchange for monetary benefits.[8]

39.   The California Consumer Privacy Act ("CCPA") recognizes that consumers' personal data is a property right. Not only does the CCPA prohibit covered businesses from discriminating against consumers who opt-out of data collection, the CCPA also expressly provides that: "[a] business may offer financial incentives, including payments to consumers as compensation, for the collection of personal information, the sale of personal information, or the deletion of personal information." Cal. Civ. Code § 1798.125(b)(1). The CCPA provides that, "[a] business shall not use financial incentive practices that are unjust, unreasonable, coercive, or usurious in nature." Cal. Civ. Code § 1798.125(b)(4).

40.   Through its false representations and unlawful data collection and dissemination, Respondent is unjustly enriching itself at the cost of consumer choice, when the consumer could otherwise have the ability to choose if and how they wish to monetize their personal data.

## CLAIMANT'S EXPERIENCES

41.   During the last year, Claimant visited the Website to view content available on the Website.

---

[7] Kevin Mercandante, Ten Apps for Selling Your Data for Cash, Best Wallet Hacks (June 10, 2020), https://wallethacks.com/apps-for-selling-your-data/.

[8] Kari Paul, Google launches app that will pay users for their data, The Guardian (June 11, 2019), https://www.theguardian.com/technology/2019/jun/11/facebook-user-data-app-privacy-study; Saheli Roy Choudhury and Ryan Browne, Facebook pays teens to install an app that could collect all kinds of data, CNBC (Jan. 30, 2019), https://www.cnbc.com/2019/01/29/facebook-paying-users-to-install-app-to-collect-data-techcrunch.html; Jay Peters, Facebook will now pay you for your voice recordings, The Verge (Feb. 20, 2020), https://www.theverge.com/2020/2/20/21145584/facebook-pay-record-voice-speech-recognition-viewpoints-prounnunciations-app.

42.    When Claimant visited the Website, he was presented with a cookie pop-up banner and was given the option to click the "Do Not Sell My Personal Information" link to visit the consent preference center and reject "Performance Cookies" and "Online Behavioural Advertising" cookies indicating Claimant's choice/agreement to reject **all** cookies except those "Strictly Necessary" for the Website's function. Claimant believed that taking these actions would allow him to opt-out of, decline, and/or reject all cookies not "Strictly Necessary"— including all third-party cookies— and keep his communications with the Website private.

43.    Consistent with Claimant's typical practice, Claimant clicked on the "Do Not Sell my Personal Information" link and rejected "Performance Cookies" and "Online Behavioural Advertising" cookies, indicating his choice/agreement to reject all cookies except for those "Strictly Necessary," which Claimant was unable to reject. Respondent's representations on the cookies pop-up banner and in the consent preference center led Claimant, and those similarly situated, to believe that they rejected all Performance Cookies and Online Behavioural Advertising cookies.

44.    Claimant believed that his rejection of the Performance Cookies and Online Behavioural Advertising cookies would keep his communications with the Website private.

45.    By rejecting Performance Cookies and Online Behavioural Advertising cookies, Claimant gave Respondent notice that he did not consent to the placement of such third-party cookies from the Website. In reliance on Respondent's representations and promises, only then did Claimant continue browsing the Website.

46.    Despite the fact that Claimant rejected Performance Cookies and Online Behavioural Advertising cookies, unbeknownst to him, Respondent nonetheless continued to cause the placement of such third-party cookies, including those from LinkedIn, Google/DoubleClick, Yahoo, and many others, on his device. In doing so, Respondent caused the transmission of private communications and data to third parties as Claimant browsed the Website.

47.    Respondent's representations that consumers could reject Performance Cookies and Online Behavioural Advertising cookies was untrue. Had Claimant known this fact, he

COMPLAINT AND DEMAND FOR ARBITRATION

would not have used the Website. Moreover, Claimant reviewed the cookie pop-up banner prior to using the Website. Had Respondent disclosed that it would continue to cause third-party cookies to be stored on consumers' devices even when they choose to reject all such cookies, Claimant would have noticed it and would not have used the Website or, at a minimum, would have interacted with the Website differently.

48.    Claimant continues to desire to browse the Website and would like to browse other, similar websites that do not misrepresent that users can reject Performance Cookies and Online Behavioural Advertising cookies. If the Website was reconfigured to honor users' requests to reject all such cookies, Claimant would likely browse the Website again in the future but will not do so until then. Claimant regularly visits websites that feature content similar to that of the Website. Because Claimant does not know how the Website is configured, which can change over time, and cannot test whether the Website honors users' requests to reject Performance Cookies and Online Behavioural Advertising cookies, Claimant will be unable to rely on Respondent's representations when browsing the Website in the future absent an injunction that prohibits Respondent from making misrepresentations on its Website.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**Invasion of Privacy Under California's Constitution**

49.    Claimant realleges and incorporates the paragraphs of this Complaint as if set forth herein.

50.    California's constitution creates a right to privacy, and further creates a right of action against private entities such as Respondent.

51.    The principal purpose of this constitutional right is to protect against unnecessary information gathering, use, and dissemination by public and private entities, including Respondent.

52.    Article I, Section 1 of the California Constitution provides:

"All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing,

- 25 -
COMPLAINT AND DEMAND FOR ARBITRATION

and protecting property and pursuing and obtaining safety, happiness, and privacy."

53.    The phrase "and privacy" was added in 1972 after voters approved a proposed legislative constitutional amendment designated as Proposition 11. Proposition 11 was intended to curb businesses' control over the unauthorized collection and use of peoples' personal information, as the ballot argument stated:

> The right of privacy is the right to be left alone . . . It prevents government and business interests from collecting and stockpiling unnecessary information about us and from misusing information gathered for one purpose in order to serve other purposes or to embarrass us. Fundamental to our privacy is the ability to control circulation of personal information. This is essential to social relationships and personal freedom.[9]

54.    This amended constitutional provision addresses the concern over accelerating encroachment on personal freedom and security caused by increasing surveillance and data collection activity in contemporary society. Its proponents meant to afford individuals more measures of protection against this growing threat to personal privacy:

> Computerization of records makes it possible to create 'cradle-to-grave' profiles of every American. At present there are no effective restraints on the information activities of government and business. This amendment creates a legal and enforceable right of privacy for every Californian.[10]

*Id*. In recognizing these privacy rights, the California Constitution provides insight into, and serves to define, the nature of the reasonable expectation of privacy of an objectively reasonable California resident.

55.    To plead a California constitutional privacy claim, Claimant must show an invasion of (i) a legally protected privacy interest; (ii) where Claimant had a reasonable expectation of privacy in the circumstances; and (iii) conduct by Respondent constituting a serious invasion of privacy.

56.    Respondent has intruded upon the following legally protected privacy interests of Claimant: (i) the California Invasion of Privacy Act, as alleged herein; (ii) the California Constitution, which guarantees Californians the right to privacy; (iii) the California Wiretap

---

[9] Ballot Pamp., Proposed Stats. & Amends. To Cal. Const. With Arguments to Voters. Gen. Election *26 (Nov. 7, 1972).
[10] *Id*.

COMPLAINT AND DEMAND FOR ARBITRATION

Acts as alleged herein; (iv) Cal. Penal Code § 484(a), which prohibits the knowing theft or defrauding of property "by any false or fraudulent representation or pretense;" and (v) Claimant's Fourth Amendment right to privacy. Claimant has a reasonable expectation of privacy in the conduct of his life, including his internet browsing activities and in the electronic communications and exchange of personal data with Respondent, since, among other things, Respondent affirmatively promised Claimant that he could reject Performance Cookies and Online Behavioural Advertising cookies. Claimant directed his electronic devices to access the Website, and when he was presented with the cookies pop-up banner and consent preferences center on the Website, he reasonably expected that his rejection of Performance Cookies and Online Behavioural Advertising cookies would be honored. That is, he reasonably believed that Respondent would not cause the placement of such cookies while he browsed the Website. Claimant also reasonably expected that, if he rejected Performance Cookies and Online Behavioural Advertising cookies, Respondent would not share his communications and data with third parties or collect such data itself. Claimant further reasonably expected that the Website would not cause his browser to store and send cookies and other data to third parties, which then used that data to track Claimant's activity, such as the URLs being browsed by Claimant as well as the referrer URL; webpage title; webpage keywords; the exact date and time of the Website visits; the IP address of Claimant's computer; product page visits; and/or data that Claimant supplied to the Website. Such information is "personal information" under California law, which defines personal information as including "Internet or other electronic network activity information," such as "browsing history, search history, and information regarding a consumer's interaction with an internet website, application, or advertisement." Cal. Civ. Code § 1798.140.

57.    Respondent, in violation of Claimant's reasonable expectation of privacy, allowed third-party cookie companies to collect, track and compile the web browsing activity and communications of Claimant and those similarly situated. The data that Respondent allowed third parties to collect enabled third parties to assemble comprehensive profiles of Claimant's life. Those profiles are, and can be, used to further invade Claimant's privacy, by,

*inter alia*, allowing third parties to learn intimate details of Claimant's life and target him for advertising and other purposes as described herein, thereby harming Claimant through the abrogation of Claimant's autonomy and ability to control dissemination and use of his personal information.

58.     Respondent's actions constituted a serious invasion of privacy in that those actions invaded a zone of privacy protected by the Fourth Amendment—i.e., one's personal communications—and violated criminal laws on wiretapping and invasion of privacy. These acts constitute an egregious breach of social norms that is highly offensive.

59.     Respondent's intrusion into Claimant's privacy was also highly offensive to a reasonable person in that Respondent violated criminal and civil laws designed to protect individual privacy and against theft.

60.     The surreptitious and unauthorized disclosure of the internet activity and communications of thousands, if not millions, of consumers constitutes an egregious breach of social norms.

61.     Respondent lacked a legitimate business interest in causing the placement of third-party cookies that allowed third-party companies, including marketing, advertising, and social media companies, to track, intercept, receive, and collect data about users and their browsing history without their consent.

62.     Claimant has been damaged by Respondent's invasion of his privacy and is entitled to just compensation, including disgorgement of profits related to the unlawful tracking, and injunctive relief.

## SECOND CAUSE OF ACTION

### Violation of the California Invasion of Privacy Act

### California Penal Code § 631

63.     Claimant realleges and incorporates by reference all paragraphs alleged herein.

64.     California Penal Code § 631(a) provides, in pertinent part:

"Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to

COMPLAINT AND DEMAND FOR ARBITRATION

learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars . . . ."

65.    To establish liability under § 631(a), a Claimant need only establish that a Respondent, "by means of any machine, instrument, contrivance, or in any other manner," did any of the following:

Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,

Or

Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,

Or

Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,

Or

Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

Cal. Penal Code § 631(a).

66.    Respondent is a "person" within the meaning of California Penal Code § 631.

67.    Under § 631(a), Respondent must show it had the consent of all parties to a communication.

68.    Respondent did not have the consent of all parties to learn the contents of or record Claimant's private communications. Respondent also did not have consent to allow third parties to learn the contents of or record Claimant's private communications.

- 29 -
COMPLAINT AND DEMAND FOR ARBITRATION

69.    Respondent utilizes software code on the Website that allows third parties to intercept Claimant's private communications and web activity on the Website.

70.    The Website causes the user's browser to store cookies from third parties, and to transmit those cookies alongside other data—such as button clicks, and specific URL visits—to the third-party. By configuring the Website in this manner, Respondent intentionally accessed, intercepted, read, learned, and/or collected the electronic communications of Claimant, and aided and abetted the third-party cookie companies, including LinkedIn, Google/DoubleClick, and Yahoo, to access, intercept, read, learn, and/or collect the electronic communications of Claimant as well.

71.    Section 631(a) is not limited to phone lines, but also applies to "new technologies," such as computers, the Internet, and email. *See Matera v. Google* Inc., 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *Bradley v. Google, Inc.*, 2006 WL 3798134, at *5–6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020) (reversing dismissal of CIPA and common law privacy claims based on Facebook's collection of consumers' Internet browsing history).

72.    The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA (and even if they do not, Respondent's deliberate and purposeful scheme that facilitated the interceptions falls under the broad statutory catch-all category of "any other manner"): (i) the Website, including the software code modules therein that are designed to cause the transmission of consumers' communications and web activity to third-parties; (ii) the third-party cookies on the Website; (iii) Respondent's computer servers, including the software code modules installed on and/or served by those servers used to place cookies and/or intercept, aid and abet others to intercept, receive, transmit, read, track, and analyze Claimant's communications; and (iv) the plan Respondent carried out to place cookies and/or intercept, aid and abet others to intercept, collect, transmit, read, and track Claimant's communications, even though Claimant explicitly declined such actions (collectively, the "Politico Instruments").

73. The private communications that were intercepted, collected, transmitted, received, tracked, and analyzed by the "machine[s], instrument[s], or contrivance[s]" alleged above included, the following:

- internet IP address of consumers' devices;

- the URLs browsed by users of the Website, as well as the referrer URL;

- the title of webpage viewed;

- webpage keywords;

- the exact date and time of the website visits; and

- device identifiers.

(Collectively, the information listed in the bullet points above shall be referred to as "Private Communications.")

74. By enabling the Politico Instruments to intercept, collect, transmit, receive, track, and analyze Claimant's Private Communications without Claimant's consent, and by aiding and abetting third parties to intercept, collect, transmit, receive, track, and analyze such Private Communications, Respondent violated Section 631(a) of the CIPA. In particular, Respondent:

- intentionally tapped, electrically or otherwise, the lines and/or instruments of internet communication being used by Claimant to access the Website;

- intentionally made unauthorized connections, electrically or otherwise, with the lines and/or instruments of internet communication being used by Claimant to access the Website and allowed third parties to do so;

- willfully, and without the consent of Claimant, read and learned the contents and/or meaning of Claimant's messages and communications containing Private Communications, while the same was in transit or passing over lines of internet communication, or was being sent from and received at locations in California and allowed third parties to do so;

- 31 -
COMPLAINT AND DEMAND FOR ARBITRATION

- used Claimant's Private Communications to increase Respondent's profits;
- allowed third parties to intercept, collect, transmit, receive, track, and analyze Claimant's Private Communications; and
- aided, agreed with, and conspired with other persons (including, without limitation, LinkedIn, Google/DoubleClick, Yahoo, and other third-party cookie companies) to unlawfully do, permit, and cause to be done the above-listed activities.

75. Claimant has suffered loss by reason of these violations, including, but not limited to, (i) violation of his right to privacy; and (ii) loss of value in his Private Communications.

76. Unless enjoined, Respondent will continue to commit the illegal acts alleged here. Claimant continues to be at risk because Claimant frequently uses the internet to search for information about political content and policy such as that on the Website. Claimant continues to desire to use the internet for that purpose. Claimant has no practical way to know if his request to decline cookies will be honored and/or whether his actions on the Website will be monitored or recorded by Respondent. Further, Respondent and third parties have already intercepted Claimant's Private Communications, and are currently sharing, and will continue sharing, that information with additional third parties, unless and until enjoined.

77. Claimant seeks all relief available under the California Invasion of Privacy Act, including injunctive relief and statutory damages.

### THIRD CAUSE OF ACTION

**Violation of the California Invasion of Privacy Act**

**California Penal Code § 635**

78. Claimant realleges and incorporates by reference all paragraphs alleged herein.

79. The California Invasion of Privacy Act, codified at Cal. Penal Code §§ 630 to 638, includes the following statement of purpose:

COMPLAINT AND DEMAND FOR ARBITRATION

The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

80.    California Penal Code § 635 provides as follows:

Every person who manufactures, assembles, sells, offers for sale, advertises for sale, possesses, transports, imports, or furnishes to another any device which is primarily or exclusively designed or intended for eavesdropping upon the communication of another, or any device which is primarily or exclusively designed or intended for the unauthorized interception or reception of communications between cellular radio telephones or between a cellular radio telephone and a landline telephone in violation of Section 632.5, or communications between cordless telephones or between a cordless telephone and a landline telephone in violation of Section 632.6 , shall be punished by a fine not exceeding two thousand five hundred dollars.

81.    Respondent intentionally manufactured, assembled, sold, offered for sale, advertised for sale, possessed, transported, imported, and/or furnished one or more wiretap devices (i.e., the Politico Instruments, including the software code modules therein) primarily or exclusively designed or intended for eavesdropping upon the communication of another (i.e., Claimant).

82.    In particular, the Politico Instruments contain software code modules that are primarily or exclusively designed to enable third parties to intercept, collect, transmit, receive, and track communications that users reasonably (but erroneously) believed would be sent directly and exclusively to Respondent. Further, even though Claimant intended to reject Performance Cookies and Online Behavioural Advertising cookies, the software code modules of the Politico Instruments were designed to—and in fact did—cause the placement of cookies and software code which were used to intercept, collect, transmit, receive, track, analyze, and sell users' Private Communications to third parties.

83.    Claimant did not consent to any of Respondent's actions in implementing the wiretaps.

COMPLAINT AND DEMAND FOR ARBITRATION

84. Claimant has suffered loss by reason of these violations, including, but not limited to, (i) violation of his right to privacy; and (ii) loss of value in his Private Communications.

85. Unless enjoined, Respondent will continue to commit the illegal acts alleged here. Claimant continues to be at risk because he frequently uses the internet to view political and policy content such as that on the Website. Claimant continues to desire to use the internet for that purpose, including for the purpose of viewing Politico-related content. Claimant has no practical way to know if his request to decline cookies will be honored and/or whether his actions on the Website will be monitored or recorded by Respondent. Further, Respondent has already collected his Private Communications, and is currently sharing, and will continue sharing, that information with third parties, unless and until enjoined.

86. Claimant seeks all relief available under the California Invasion of Privacy Act, including injunctive relief and statutory damages.

## FOURTH CAUSE OF ACTION

**Violation of the California Comprehensive Computer Data Access and Fraud Act**

**California Penal Code § 502**

87. Claimant realleges and incorporates by reference all paragraphs alleged herein.

88. Cal. Penal Code § 502 provides: "For purposes of bringing a civil or a criminal action under this section, a person who causes, by any means, the access of a computer, computer system, or computer network in one jurisdiction from another jurisdiction is deemed to have personally accessed the computer, computer system, or computer network in each jurisdiction." Devices with web browsers are "computers" within the meaning of the statute.

89. Respondent violated Cal. Penal Code § 502(c) by, among other things, (i) knowingly causing Claimant's and other users' computers to be accessed through third-party cookies and third-party software code that causes the transmission of users' data to be transmitted to third-party cookie companies; (ii) knowingly accessing and without permission using Claimant's and other users' data and computers to devise or execute any scheme or artifice to defraud and/or deceive, and wrongfully obtain data; and (iii) knowingly accessing,

and without permission making use of data from Claimant and other users' computers as well as allowing third parties to do so.

90. Despite Respondent's false representations to the contrary, Respondent was unjustly enriched, by acquiring Claimant's sensitive and valuable personal information without permission and using it for Respondent's own financial benefit. Claimant retains a stake in the profits Respondent earned from Claimant's personal browsing history and other data because, under the circumstances, it is unjust for Respondent to retain those profits.

91. Respondent allowed third parties and itself to access, copy, take, analyze, and use data from Claimant's devices while he was in the State of California. Accordingly, Respondent is deemed to have accessed Claimant's devices in California.

92. As a direct and proximate result of Respondent's unlawful conduct within the meaning of Cal. Penal Code § 502, Respondent has caused loss to Claimant and has been unjustly enriched.

93. Claimant seeks compensatory damages and/or disgorgement, and declarative, injunctive, or other equitable relief.

94. Claimant is entitled to punitive or exemplary damages pursuant to Cal. Penal Code § 502(e)(4) because Respondent's violations were willful and, upon information and belief, Respondent is guilty of oppression, fraud, or malice as defined in Cal. Civil Code § 3294.

95. Claimant is also entitled to recover reasonable attorneys' fees pursuant to Cal. Penal Code § 502(e).

## FIFTH CAUSE OF ACTION

### Violation of the California False Advertising Law,

### Cal. Bus. & Prof. Code §§ 17500, *et seq.* ("FAL")

96. Claimant realleges and incorporates by reference all paragraphs alleged herein.

97. Beginning at an exact date unknown to Claimant, but within four (4) years preceding the filing of this Complaint, Respondent, with the intent to directly or indirectly perform services, or to induce members of the public to enter into obligations relating thereto,

made or disseminated or caused to be made or disseminated before the public and Claimant statements concerning such services, or matters of fact connected with the performance thereof, which were untrue or misleading, and which Respondent knew, or in the exercise of reasonable care should have known, were untrue or misleading, in violation of the FAL. In particular, Respondent made untrue, false, deceptive, and/or misleading statements on the Website popup cookies banner, consent preference center, and Privacy Policy.

98.    Respondent's cookie pop-up banner, consent preference center, and Privacy Policy assert facts about its services that are untrue and likely to deceive and mislead the public and reasonable consumers. In particular, Respondent made representations and statements (by omission and commission) that consumers could reject Performance Cookies and Online Behavioural Advertising cookies. These representations led reasonable customers to believe that they could reject such cookies and, in doing so, Respondent would not cause the placement of third-party cookies on consumers' devices and browsers for those purposes, nor could third parties collect, receive, intercept, and compile data about users' browsing activity and Private Communications from the Website. Respondent had a duty to disclose that, despite consumers election to reject such cookies, the Website would nonetheless cause the user's browser to store cookies and send data to third parties, who can then use that data to track the user's activity and target them with advertising.

99.    Claimant, and those similarly situated, relied to their detriment on Respondent's false, misleading, and deceptive advertising and marketing practices, including each of the misrepresentations and omissions set forth above. Relying on Respondent's misrepresentations about its services—specifically its false and misleading representation that users could reject Performance Cookies and Online Behavioural Advertising cookies—Claimant used the Website.

100.    Respondent's actions caused damage to and loss of Claimant's property right to control the dissemination and use of Claimant's personal information and communications.

101.    Respondent's representations that consumers could reject Performance Cookies and Online Behavioural Advertising cookies if they selected to opt-out of such cookies was

untrue. Again, had Claimant known these facts, he would not have used the Website. Moreover, Claimant reviewed the cookie pop-up banner and the information on the consent preference center (i.e., the "Do Not Sell My Personal Information" settings) prior to using the Website. Had Respondent disclosed that it caused such third-party cookies to be stored on consumers' devices even when they choose to reject such cookies, Claimant would have noticed it and would not have used the Website.

102.    Respondent's acts and omissions are likely to deceive the general public.

103.    Respondent engaged in these false, misleading, and deceptive advertising and marketing practices to increase its profits. Respondent generated revenue by using the wrongfully collected information to, among other things, engage in targeted advertising.

104.    Accordingly, Respondent has engaged in false advertising, as defined and prohibited by Section 17500, *et seq.* of the California Business and Professions Code.

105.    The aforementioned practices, which Respondent used, and continues to use to its significant financial gain, also constitute unlawful competition and provide an unlawful advantage over Respondent's competitors as well as injury to the general public.

106.    Claimant has suffered an injury-in-fact, including the loss of money and/or property as a result of Respondent's unfair, deceptive, and/or unlawful practices, including the unauthorized disclosure and taking of his personal information which has value as demonstrated by the use and sale of consumers' browsing activity, as alleged above. Claimant has also suffered harm in the form of diminution of the value of his Private Communications and data.

107.    Respondent's actions caused damage to and loss of Claimant's property right to control the dissemination and use of his personal information and communications.

108.    Claimant seeks, on behalf of himself and those similarly situated, a declaration that the above-described practices constitute false, misleading, and deceptive advertising.

109.    Claimant seeks full restitution of monies, as necessary and according to proof, to restore any and all monies acquired by Defendant from Plaintiff and those similarly situated

COMPLAINT AND DEMAND FOR ARBITRATION

by means of the false, misleading and deceptive advertising and marketing practices complained of herein, plus interest thereon.

110.    Claimant seeks, on behalf of himself and those similarly situated, an injunction to prohibit Respondent from continuing to engage in the false, misleading, and deceptive advertising and marketing practices complained of herein. Such misconduct by Respondent, unless and until enjoined and restrained, will continue to cause injury in fact to the general public and the loss of money and property in that Respondent will continue to violate the laws of California, unless specifically ordered to comply with the same. This expectation of future violations will require current and future consumers to repeatedly and continuously seek legal redress in order to recover monies paid to Respondent to which they are not entitled. Claimant, those similarly situated, and/or other consumers have no other adequate remedy at law to ensure future compliance with the California Business and Professions Code alleged to have been violated herein.

## SIXTH CAUSE OF ACTION

### Violation of the California Unfair Competition Law,

### Cal. Bus. & Prof. Code §§ 17200, *et seq.* ("UCL")

111.    Claimant realleges and incorporates by reference all paragraphs alleged herein.

112.    The UCL prohibits any "unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200. By engaging in the aforementioned practices, Respondent has violated the UCL.

113.    Respondent is a "person" under Cal. Bus. & Prof. Code § 17201.

114.    Respondent created and implemented a scheme to obtain and share the Private Communications and private web activity from web users through a pervasive pattern of false and misleading misrepresentations and omissions. Respondent misrepresented to Claimant and other web users that they could reject Performance Cookies and Online Behavioural Advertising cookies when, in fact, Respondent caused such cookies to be placed on consumers' devices and browsers, even after users rejected those cookies. Respondent concealed and failed to disclose to Claimant and other web users that it would cause cookies and software code to be

stored on consumers' devices and browsers which would cause the interception and transmission of data about users' activity on the Website and Private Communications to third parties and Respondent, despite consumers' clear refusal of such cookies. Further, Respondent failed to disclose to Claimant and web users that these third-party cookies enable third parties to track consumers' behavior across the Website and use that data to compile profiles of consumers for targeted advertising and marketing purposes. In particular, the third-party cookies that Respondent wrongfully placed on consumers' devices and browsers enabled third parties and Respondent to track and collect consumers' Private Communications and browsing history on the Website. With this information, third parties can—and almost invariably do—develop and enrich profiles on consumers, like Claimant, to, among other things, target advertising to them.

115. These representations and omissions were misleading and deceptive.

116. Respondent's conduct was unfair and unconscionable, particularly because Respondent allowed third parties to intrude on communications that Website users reasonably believed to be private, and because Respondent made users' Private Communications available to third parties, despite representing that Website users could reject Performance Cookies and Online Behavioural Advertising cookies.

117. Respondent's conduct was fraudulent and deceptive because the misrepresentations and omissions at issue were likely to, and in fact did, deceive reasonable consumers. Reasonable consumers, including Claimant, would have found it material to their decisions to use the Website that Respondent would intercept, collect, transmit, receive, track, and analyze consumers' Private Communications against their wishes and without their consent, and make those Private Communications available to third parties via cookies despite their clear refusal of such cookies. Knowledge of these facts would have been a substantial factor in the consumers' decisions to use the Website.

118. Respondent's acts and practices constitute a continuing and ongoing unfair business activity defined by the UCL. Respondent's conduct is contrary to the public welfare as it transgresses civil and criminal statutes of the State of California designed to protect

individuals' constitutional and statutory rights to privacy, violates established public policy, and has been pursued to attain an unjustified monetary advantage for Respondent by creating personal disadvantage and hardship to users of the Website. As such, Respondent's business practices and acts have been immoral, unethical, oppressive, and unscrupulous and have caused injury to customers far greater than any alleged countervailing benefit. The harm to consumers, which includes the interception of their communications by third parties, the wrongful collection and tracking of consumers' Private Communications, and the construction of profiles about consumers that third parties and Respondent use for their monetary gain, far outweigh the value of Respondent's conduct (i.e., the wrongful placement of third-party cookies on consumers' devices and browsers even when consumers reject such cookies).

119. Further, Respondent's "unfair" acts and practices include its violation of property, economic and privacy interests protected by the statutes identified above. To establish liability under the unfair prong, Claimant need not establish that these statutes were actually violated, although the claims pleaded herein do so.

120. Respondent owed Claimant a duty to disclose these facts because they were exclusively known and/or accessible to Respondent, who had superior knowledge of its activities with respect to the Private Communications of Claimant and users; because Respondent actively concealed the facts; and because Respondent intended for consumers to rely on the omissions in question. Moreover, Respondent's omissions were contrary to representations that Respondent actually made to consumers that they could reject Performance Cookies and Online Behavioural Advertising cookies.

121. Claimant, and those similarly situated, relied on Respondent's misrepresentations and omissions. Reasonable consumers would have relied on Respondent's promise to consumers that they could reject Performance Cookies and Online Behavioural Advertising cookies, and, in light of that promise, would have relied on the omissions, particularly because Respondent made representations to the contrary and consumers were not informed that Respondent would cause third-party cookies to be stored on consumers' devices and browsers, despite consumers' clear rejection of such third-party cookies.

122.    Respondent's conduct was also unlawful in that it violated the following statutes: the California Invasion of Privacy Act, Cal. Penal Code §§ 502, 630–638; the FAL; and the CLRA. Respondent's conduct also breached the promises Respondent made in its popup cookie banner, consent preference center, and the Privacy Policy.

123.    Moreover, Respondent's conduct was unlawful and violated California's Consumer Privacy Act, Cal. Civ. Code § 1798.100, *et seq.*, which sets strict standards regarding the collection, use, retention, sharing, and sale of "personal information," including but not limited to, §§ 1798.100(a), (b), (c), (e), 1798.110, 1798.115, 1798.120, 1798.130.

124.    For instance, Respondent violated Cal. Civ. Code § 1798.100(a) and § 1798.115 by (a) informing consumers that they could reject Performance Cookies and Online Behavioural Advertising cookies, but, nonetheless, causing such cookies to be placed on users' devices and browsers and causing the transmission of consumers' Private Communications to third parties after users rejected such cookies; (b) failing to inform consumers that third parties would collect their Private Communications; and (c) failing to inform consumers that third-party cookie companies would use data collected to compile profiles on consumers. Respondent further violated Cal. Civ. Code § 1798.100(e) because Respondent collects consumers' personal information and did not implement reasonable security procedures and practices appropriate to the nature of the personal information to protect the personal information from unauthorized or illegal access, destruction, use, modification, or disclosure in accordance with Cal. Civ. Code § 1798.81.5. Such security procedures Respondent could have implemented could have been to simply honor consumers' requests to reject Performance Cookies and Online Behavioural Advertising cookies.

125.    Respondent also violated Cal. Civ. Code § 1798.120 because it received direction from Claimant and other users not to sell their personal information when they chose to reject Performance Cookies and Online Behavioural Advertising cookies, but Respondent nonetheless caused third-party cookies to be placed on Claimant and other users' devices and browsers, and thereby sold their Private Communications to third-parties.

126. Claimant has suffered an injury-in-fact, including the loss of money and/or property as a result of Respondent's unfair, deceptive, and/or unlawful practices, including the unauthorized disclosure and taking of his personal information which has value as demonstrated by the use and sale of consumers' browsing activity, as alleged above. Claimant has also suffered harm in the form of diminution of the value of his private and personally identifiable data and content.

127. Respondent's actions caused damage to and loss of Claimant's property right to control the dissemination and use of his personal information and Private Communications.

128. Respondent's representation that consumers could reject Performance Cookies and Online Behavioural Advertising cookies if they selected to opt-out of such cookies was untrue. Again, had Claimant known these facts, he would not have used the Website. Moreover, Claimant reviewed the popup cookie banner and the consent preference center (i.e. the "Do Not Sell My Personal Information" settings) prior to using the Website. Had Respondent disclosed that it causes third-party cookies to be stored on consumers' devices even after they choose to reject Performance Cookies and Online Behavioural Advertising cookies, Claimant would have noticed it and would not have used the Website.

129. The wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Respondent's business. Respondent's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, in the State of California.

130. Claimant, on behalf of himself and the general public, seeks restitution, injunctive relief, and reasonable attorneys' fees, as well as any other relief deemed proper.

### SEVENTH CAUSE OF ACTION

**Violation of the Consumers Legal Remedies Act**

**California Civil Code §§ 1750, *et seq.* ("CLRA")**

131. Claimant realleges and incorporates by reference all paragraphs alleged herein.

132. Respondent's actions, representations, and conduct described herein have violated, and continue to violate, the CLRA, because they extend to transactions that are

intended to result, or which have resulted, in the sale or lease of goods or services to consumers.

133.    Claimant, and other Website users, are "consumers" as that term is defined by the CLRA in California Civil Code § 1761(d).

134.    The Website and Respondent's online platform services are "services" under the CLRA.

135.    Respondent's representations, set forth in this Complaint, led Website users to falsely believe that they could reject Performance Cookies and Online Behavioural Advertising cookies, and in doing so, Respondent would not cause such cookies and third-party software code to be placed on consumers' devices to cause the transmission of consumers' web activity and Private Communications to third parties and allow Respondent and third parties to track consumers' behavior on the Website. By engaging in the actions, representations, and conduct set forth in this Complaint, Respondent has violated, and continues to violate, § 1770(a)(5), § 1770(a)(7), and § 1770(a)(9) of the CLRA. In violation of California Civil Code § 1770(a)(5), Respondent's acts and practices constitute improper representations that its Website service has sponsorship, approval, characteristics, uses, or benefits, which it does not have. In violation of California Civil Code § 1770(a)(7), Respondent's acts and practices constitute improper representations that its Website service is of a particular standard, quality, or grade, when it is of another. In violation of California Civil Code § 1770(a)(9), Respondent has advertised services with intent not to sell them as advertised.

136.    Claimant requests that Respondent be enjoined from continuing to employ the unlawful methods, acts, and practices alleged herein pursuant to California Civil Code § 1780(a)(2). If Respondent is not restrained from engaging in these types of practices in the future, Claimant and users will continue to suffer harm. Claimant, and those similarly situated, have no adequate remedy at law to stop Respondent's continuing practices.

137.    On or about August 18, 2023, Respondent was provided with notice and a demand to correct, or otherwise rectify the unlawful, unfair, false and/or deceptive practices complained of herein. Despite receiving the notice and demand, Respondent failed to do so.

- 43 -
COMPLAINT AND DEMAND FOR ARBITRATION

Among other things, Respondent failed to identify consumers, notify them of their right to remedies under the CLRA, and/or to provide that remedy. Accordingly, Claimant seeks, pursuant to California Civil Code § 1780(a)(3), compensatory damages, punitive damages, and restitution of any ill-gotten gains due to Respondent's acts and practices.

138.    Claimant also requests that he be awarded costs and reasonable attorneys' fees pursuant to California Civil Code § 1780(d).

## EIGHTH CAUSE OF ACTION

### Intrusion Upon Seclusion

139.    Claimant realleges and incorporates by reference all paragraphs alleged herein.

140.    To assert a claim for intrusion upon seclusion, a Claimant must plead (i) that the Respondent intentionally intruded into a place, conversation, or matter as to which Claimant had a reasonable expectation of privacy; and (ii) that the intrusion was highly offensive to a reasonable person.

141.    By causing third-party cookies to be stored on consumers' devices, which enabled third parties to intercept, collect, transmit, receive, track, and analyze consumers' internet activity and Private Information in violation of Respondent's representations that consumers could reject Performance Cookies and Online Behavioural Advertising cookies, Respondent intentionally intruded upon the solitude and/or seclusion of users in that Respondent effectively placed third parties, including LinkedIn, Google/DoubleClick, and Yahoo, in the middle of communications to which they were not invited, welcomed, or authorized.

142.    The tracking and access caused by the cookies that Respondent caused to be stored on consumers' devices was not authorized by Claimant, and, in fact, Claimant specifically chose to reject such cookies.

143.    Claimant had an objectively reasonable expectation of privacy surrounding his communications and web browsing activity on the Website based on Respondent's promises that users could reject Performance Cookies and Online Behavioural Advertising cookies, and state criminal and civil laws designed to protect individual privacy. Moreover, its own Privacy

COMPLAINT AND DEMAND FOR ARBITRATION

Policy represented that Website users could "opt out of the sale of [their] personal information" by clicking the "Do Not Sell My Information" button.

144.    Respondent's intentional intrusion into Claimant's internet communications and web browsing history would be highly offensive to a reasonable person given that Respondent represented that consumers could reject Performance Cookies and Online Behavioural Advertising cookies when, in fact, it caused those types of cookies to be stored on consumers' devices and browsers even after consumers rejected all such cookies. Indeed, Claimant reasonably expected, based on Respondent's false representations, that Respondent would not cause such cookies to be stored on Claimant's devices or cause the transmission of Claimant's internet activities to third parties.

145.    Respondent's conduct was intentional and intruded on Claimant's communications which constitute private searches, web browsing activity, and other data.

146.    Claimant has been damaged as a direct and proximate result of Respondent's invasion of his privacy and is entitled to just compensation. Respondent's invasion of privacy caused Claimant to suffer damages, including but not limited to:

      a.    Nominal damages;

      b.    General damages for invasion of his privacy rights in an amount to be determined by a jury without reference to specific pecuniary harm;

      c.    Sensitive and confidential information that Claimant intended to remain private is no longer private; and

      d.    Respondent and the third-party cookie companies took something of value from Claimant and derived benefits therefrom without Claimant's knowledge or informed consent and without sharing the benefit of such value.

147.    Claimant seeks appropriate relief for that injury, including but not limited to, damages that will reasonably compensate him for the harm to his privacy interests as well as disgorgement of profits made by Respondent as a result of its intrusions upon Claimant's privacy.

## NINTH CAUSE OF ACTION

**Breach of Contract**

148.    Claimant realleges and incorporates by reference all paragraphs alleged herein.

149.    Respondent's relationship with its users is governed by the Website's cookies pop-up banner, the consent preference center (i.e., the "Do No Sell My Information" settings), and the Privacy Policy.

150.    The governing documents, including the Website's cookies pop-up banner, the consent preference center (i.e., the "Do No Sell My Information" settings), and the Privacy Policy, contain enforceable promises that Respondent made to Claimant, including but not limited to the following:

- "This Privacy Policy governs our collection, use, and disclosure of information from and about you, including through your use of the Sites and Applications . . . ."

- "To help make the Sites and Applications more responsive to the needs of users, we employ a standard software feature, called a 'cookie,' to assign each user a unique, random number that resides on a user's computer or device . . . . Cookies help us track user trends and patterns."

- "Our Site also makes use of various third-party cookie data collection and linking services. POLITICO and third-party vendors, including Google, Teads and others, may use first-party cookies (such as the Google Analytics cookies) and third-party cookies (such as the Google Ad Manager cookie) together to (i) inform, optimize, and serve ads based on your past visits to our website and (ii) report how your ad impressions, uses of ad services, and interactions with the foregoing are related to your visits to the Site. In addition, we may use Google Analytics data, including but not limited to, geographic, demographics, and interest reporting information to recognize and understand user preferences, make improvements, and for other business purposes."

- "We also may use third-party advertising companies to target and serve some of the advertisements that appear on our Sites and Applications, and these companies likewise may use their own cookies, web beacons and similar technologies to collect information about users of our Sites and Applications."

- "The California Consumer Privacy Act (CCPA) sets forth certain obligations for businesses that 'sell' personal information. Based on the definition of 'sell' under the CCPA and under current regulatory guidance, we may have sold the following categories of information about you in the past twelve months: Identifiers (such as name, address, email address, IP address, or device identifiers); internet or other network or device activity; geolocation information; professional or employment related data; potentially protected classifications (such as

- 46 -

gender, nationality, and age); physical characteristics or description (such as when you voluntarily submit a photo to our Site or Application); inferences related to the information identified. **If you wish to opt out of the sale of your personal information, please follow this link: Do Not Sell My Information**." (emphasis added).

151. Respondent breached these duties and violated these promises by causing third-party cookies, which under the terms of the Privacy Policy were Performance Cookies and/or Online Behavioural Advertising cookies, and software code to be stored on consumers' devices and browsers that cause the transmission of Claimant's and private web activity and Private Communications to third parties and Respondent even though Respondent represented that Claimant could reject Performance Cookies and Online Behavioural Advertising cookies, and Claimant, in fact, chose to opt-out of such cookies by adjusting the appropriate toggles to indicate rejection of the "Performance Cookies" and "Online Behavioural Advertising" cookies.

152. Respondent further violated these provisions because Respondent did not honor users' requests to opt-out of the selling and sharing of online data through the use of cookies and similar technologies, as described above, and because Respondent shared users' information with third parties even when users did not consent to such sharing.

153. At all relevant times and in all relevant ways, Claimant performed his obligation under the contract(s) in question or was excused from performance of such obligations through the unknown and unforeseen conduct of others.

154. As a direct and proximate result of Respondent's breach of contract, Claimant did not receive the full benefit of the bargain, and instead received services from Respondent that were less valuable than described in the contract. Claimant, therefore, was damaged in an amount at least equal to the difference in value between that which was promised and Respondent's partial, deficient, and/or defective performance.

155. Respondent's breach caused Claimant the following damages:

   a.   Nominal damages;

   b.   The diminution in value of Claimant's personal information;

c.    The loss of privacy due to Respondent making sensitive and confidential information that Claimant intended to remain private no longer private;

d.    Respondent took something of value from Claimant and derived benefits therefrom without Claimant's knowledge or informed consent and without sharing the benefit of such value; and

e.    Claimant suffered an invasion of privacy. Claimant seeks compensatory damages for the invasion of his privacy.

156.    As a direct consequence of the breaches of contract and violations of promises described above, Claimant seeks nominal damages, general damages, compensatory damages, consequential damages, unjust enrichment, and any other just relief.

## TENTH CAUSE OF ACTION

### Breach of Implied Covenant of Good Faith and Fair Dealing

157.    Claimant realleges and incorporates by reference all paragraphs alleged herein.

158.    Respondent's relationship with its users is governed by the Website's cookies pop-up banner, the consent preference center (i.e., the "Do No Sell My Information" settings), and the Privacy Policy.

159.    The governing documents, including the Website's cookies pop-up banner, the consent preference center (i.e., the "Do No Sell My Information" settings), and the Privacy Policy, contain enforceable promises that Respondent made to Claimant and users, including but not limited to the following:

- "This Privacy Policy governs our collection, use, and disclosure of information from and about you, including through your use of the Sites and Applications . . . ."

- "To help make the Sites and Applications more responsive to the needs of users, we employ a standard software feature, called a 'cookie,' to assign each user a unique, random number that resides on a user's computer or device . . . . Cookies help us track user trends and patterns."

- "Our Site also makes use of various third-party cookie data collection and linking services. POLITICO and third-party vendors, including Google, Teads and others, may use first-party cookies (such as the Google Analytics cookies) and third-party cookies (such as the Google Ad Manager cookie) together to (i) inform, optimize, and serve ads based on your past visits to our website and (ii) report how your ad

- 48 -
COMPLAINT AND DEMAND FOR ARBITRATION

impressions, uses of ad services, and interactions with the foregoing are related to your visits to the Site. In addition, we may use Google Analytics data, including but not limited to, geographic, demographics, and interest reporting information to recognize and understand user preferences, make improvements, and for other business purposes."

• "We also may use third-party advertising companies to target and serve some of the advertisements that appear on our Sites and Applications, and these companies likewise may use their own cookies, web beacons and similar technologies to collect information about users of our Sites and Applications."

• "The California Consumer Privacy Act (CCPA) sets forth certain obligations for businesses that 'sell' personal information. Based on the definition of 'sell' under the CCPA and under current regulatory guidance, we may have sold the following categories of information about you in the past twelve months: Identifiers (such as name, address, email address, IP address, or device identifiers); internet or other network or device activity; geolocation information; professional or employment related data; potentially protected classifications (such as gender, nationality, and age); physical characteristics or description (such as when you voluntarily submit a photo to our Site or Application); inferences related to the information identified. **If you wish to opt out of the sale of your personal information, please follow this link: Do Not Sell My Information."** (emphasis added).

160.   Respondent breached these duties and violated these promises by causing third-party cookies, which under the terms of the Privacy Policy were Performance Cookies and/or Online Behavioural Advertising cookies, and software code to be stored on Claimant's devices and browsers that cause the transmission of Claimant's private web activity and Private Communications to third parties and Respondent, even though Respondent promised that Claimant could reject Performance Cookies and Online Behavioural Advertising cookies, and Claimant, in fact, chose to reject such cookies.

161.   California law recognizes the implied covenant of good faith and fair dealing in every contract.

162.   In dealing between Respondent and its users, Respondent is invested with discretionary power affecting the rights of its users.

163.   Respondent purports to respect and protect its users' privacy.

164.   Despite its contractual promises to allow consumers to reject Performance Cookies and Online Behavioural Advertising cookies, Respondent took actions outside that contractual promise to deprive Claimant of benefits of his contract with Respondent.

- 49 -
COMPLAINT AND DEMAND FOR ARBITRATION

165.    Respondent's own tracking and its allowance of third parties to track and intercept internet communications was objectively unreasonable given its privacy promises.

166.    Respondent's unauthorized disclosure of users' personal information to Respondent was objectively unreasonable given Respondent's privacy promises.

167.    Respondent's conduct in tracking and causing third parties to intercept and track the internet communications of users who rejected Performance Cookies and Online Behavioural Advertising cookies evaded the spirit of the bargain made between Respondent and Claimant since it caused Claimant to surrender more data than Claimant otherwise bargained for.

168.    As a result of Respondent's misconduct and breach of its duty of good faith and fair dealing, Claimant suffered damages. Claimant did not receive the benefit of the bargain for which he contracted and for which he paid valuable consideration in the form of his personal information, which, as alleged above, has ascertainable value.

169.    As a direct consequence of the breach of the implied covenant of good faith and fair dealing described above, Claimant seeks nominal damages, general damages, compensatory damages, consequential damages, and any other just relief.

## ELEVENTH CAUSE OF ACTION

### Common Law Fraud, Deceit, and/or Misrepresentation

170.    Claimant realleges and incorporates by reference all paragraphs alleged herein.

171.    Respondent has fraudulently and deceptively informed Claimant that he could reject Performance Cookies and Online Behavioural Advertising cookies when in fact Respondent causes third-party cookies and software code to be stored on consumers' devices—including Claimant's—that cause the transmission of private web activity and Private Communications to third parties and Respondent when consumers visit and/or use the Website, even after consumers reject such cookies.

172.    These misrepresentations and omissions were known exclusively to, and actively concealed by, Respondent, not reasonably known to Claimant, and material at the time they were made. Respondent knew, or should have known, how the Website and cookies on

- 50 -

the Website functioned, through testing the Website or otherwise, and knew, or should have known, that the Website placed third-party cookies on users' devices—including Claimant's—even after users rejected such cookies. Respondent's misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Claimant as to whether to use the Website. In misleading Claimant and not so informing him, Respondent breached its duty to him. Respondent also gained financially from, and as a result of, its breach.

173.    Claimant relied to his detriment on Respondent's misrepresentations and fraudulent omissions.

174.    Claimant has suffered an injury-in-fact, including the loss of money and/or property, as a result of Respondent's unfair, deceptive, and/or unlawful practices, including the unauthorized disclosure and taking of his personal information which has value as demonstrated by the use and sale of consumers' browsing activity, as alleged above. Claimant has also suffered harm in the form of diminution of the value of his private and personally identifiable data and content.

175.    Respondent's actions caused damage to, and loss of, Claimant's property right to control the dissemination and use of his personal information and communications.

176.    Respondent's representations that consumers could reject Performance Cookies and Online Behavioural Advertising cookies if they elected to opt-out of such cookies was untrue. Again, had Claimant known these facts, he would not have used the Website. Moreover, Claimant reviewed the cookies pop-up banner prior to using the Website. Had Respondent disclosed that it causes third-party cookies to be stored on consumers' devices even when they choose to reject Performance Cookies and Online Behavioural Advertising cookies, Claimant would have noticed it and would not have used the Website.

177.    By and through such fraud, deceit, misrepresentations, and/or omissions, Respondent intended to induce Claimant, and those similarly situated, to alter their positions to their detriment. Specifically, Respondent fraudulently and deceptively induced Claimant, and those similarly situated, to, without limitation, use the Website under the mistaken belief that

Respondent would not collect data itself or share users' personal data with third parties through the cookies when consumers chose to reject Performance Cookies and Online Behavioural Advertising cookies.

178.    Claimant justifiably and reasonably relied on Respondent's misrepresentations and omissions, and, accordingly, was damaged by Respondent.

179.    As a direct and proximate result of Respondent's misrepresentations and/or omissions, Claimant has suffered damages, as alleged above.

180.    Respondent's conduct, as described herein, was wilful and malicious and was designed to maximize Respondent's profits even though Respondent knew that it would cause loss and harm to Claimant and other web users.

## TWELFTH CAUSE OF ACTION

### Negligent Misrepresentation

181.    Claimant realleges and incorporates by reference all paragraphs alleged herein.

182.    Respondent represented to Claimant a fact that was not true, namely, that users could reject Performance Cookies and Online Behavioural Advertising cookies. In truth, Respondent caused such third-party cookies and software code to be stored on consumers' devices and browsers which caused the transmission of users' private web activity and Private Communications to third parties and Respondent, even after users rejected such cookies.

183.    These representations were material at the time they were made. They concerned material facts that were essential to the decisions of Claimant and other users regarding whether and/or how to visit and use the Website.

184.    Respondent made identical misrepresentations to other Website users regarding users' ability to reject Performance Cookies and Online Behavioural Advertising cookies.

185.    Respondent should have known its representations were false, and that it had no reasonable grounds for believing them to be true when it made them.

186.    Respondent intended that Claimant and users of the Website rely on Respondent's representations.

- 52 -

COMPLAINT AND DEMAND FOR ARBITRATION

187. By and through such negligent misrepresentations, Respondent intended to induce Claimant, and those similarly situated, to alter their positions to their detriment. Specifically, Respondent negligently induced Claimant, and Website users, to without limitation, browse the Website under the mistaken belief that Respondent would not collect data itself or cause the sharing of Claimant's and those similarly situated's personal data with third parties after he/they chose to reject Performance Cookies and Online Behavioural Advertising Cookies.

188. Claimant, and those similarly situated, reasonably relied on Respondent's representations.

189. Claimant, and those similarly situated, were harmed as set forth above.

190. Claimant's, and those similarly situated's, reliance on Respondent's representation was a substantial factor in causing the harm.

## THIRTHEENTH CAUSE OF ACTION

### Trespass to Chattels

191. Claimant realleges and incorporates by reference all paragraphs alleged herein.

192. At all times relevant, Claimant owned, leased, and/or controlled his devices.

193. Respondent, intentionally and without consent or other legal justification, caused cookies to be stored on Claimant's browsers and devices, which enabled third parties and Respondent to track Claimant's activity on the Website and use the data collected for their own advantage, as described above.

194. Respondent was unjustly enriched as a result of its wrongful conduct, including through its misrepresentation that users could reject Performance Cookies and Online Behavioural Advertising cookies and its failure to disclose that it causes third-party cookies and software code to be stored on consumers' devices and browsers, which cause the transmission of users' private web activity and Private Communications to third parties and Respondent even after consumers reject such cookies.

195. Respondent's intentional and unjustified placing of cookies designed to track Claimant's internet activities and actual tracking of Claimant's activities interfered with

- 53 -

Claimant's use of the following personal property owned by Claimant: (a) his computers and other electronic devices; and (b) his personally identifiable information.

196.    Respondent's trespass of Claimant's computing devices resulted in harm to Claimant and caused Claimant the following damages:

        a.    Nominal damages for trespass;

        b.    Reduction of storage, disk space, and performance of Claimant's computing devices; and

        c.    Loss of value of Claimant's computing devices.

## FOURTEENTH CAUSE OF ACTION

### Unjust Enrichment

197.    Claimant realleges and incorporates by reference all paragraphs alleged herein.

198.    Respondent created and implemented a scheme to increase its own profits through a pervasive pattern of false statements and fraudulent omissions.

199.    Respondent was unjustly enriched as a result of its wrongful conduct, including through its misrepresentation that users could reject Performance Cookies and Online Behavioural Advertising cookies and its failure to disclose that it causes third-party cookies and software code to be stored on consumers' devices and browsers, which cause the transmission of users' private web activity and Private Communications to third parties and Respondent even after consumers reject such cookies.

200.    Respondent received a measurable benefit at the expense of Claimant in the form of the additional data Claimant surrendered at Claimant's expense.

201.    Respondent appreciated, recognized, and chose to accept the monetary benefits that Claimant conferred onto Respondent to his detriment. These benefits were the expected result of Respondent acting in its pecuniary interest at the expense of Claimant.

202.    It would be unjust for Respondent to retain the value of Claimant's property and any profits earned thereon.

203.    There is no justification for Respondent's enrichment. It would be inequitable, unconscionable, and unjust for Respondent to be permitted to retain these benefits because the

COMPLAINT AND DEMAND FOR ARBITRATION

benefits were procured as a result of its wrongful conduct. Claimant is entitled to restitution of the benefits Respondent unjustly retained and/or any amounts necessary to return Claimant to the position he occupied prior to having his Private Communications obtained by Respondent.

204.   Claimant pleads this claim separately as well as in the alternative, to his other claims, as without such claims he would have no adequate legal remedy.

**PRAYER FOR RELIEF**

WHEREFORE, reserving all rights, Claimant respectfully requests judgment against Respondent as follows:

A.   An award of compensatory damages, including statutory damages where available, to Claimant against Respondent for all damages sustained as a result of Respondent's wrongdoing, including both pre- and post-judgment interest thereon;

B.   An order for full restitution;

C.   An order requiring Respondent to disgorge revenues and profits wrongfully obtained;

D.   An order temporarily and permanently enjoining Respondent from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

E.   For reasonable attorneys' fees and the costs of suit incurred; and

F.   For such further relief as may be just and proper.

Dated: December 21, 2023

**GUTRIDE SAFIER LLP**

*/s/ Seth A. Safier /s/*
Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
  marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
  todd@gutridesafier.com
Kali R. Backer (State Bar No. 342492)
  kali@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile: (415) 449-6469

*Attorneys for Claimant*

# EXHIBIT C



**NOTICE OF CLOSING FILE**

NOTICE TO ALL PARTIES                                                 August 21, 2024

RE:     **Shah, Vishal vs. Politico LLC**
        Reference #: 5100001737

Dear Parties:

This letter is to confirm the above referenced matter is closed as of August 21, 2024.

Please contact me should you have any questions.

Sincerely,

John M. Peterson
Associate Business Manager
jpeterson@jamsadr.com